Jack Silver, Esq. SB#  160575
LAW OFFICE OF JACK SILVER
Post Office Box 5469
Santa Rosa, CA 95402-5469
Tel.  707-528-8175
Fax.  707-528-8675
Email: lhm28843@sbcglobal.net

Jerry Bernhaut, Esq. SB# 206264
23 Woodgreen Street
Santa Rosa, CA 95409
Tel. (707) 595-1852
Fax. (707) 528-8675
Email: j3bernhaut@gmail.com

Attorneys for Plaintiff
CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION, a private corporation, <br><br> Plaintiff, <br> v. <br><br> SONOMA SOIL BUILDERS, LLC and DOES 1-10, inclusive, <br><br> Defendants. <br> _____/ | CASE NO. <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL PENALTIES, RESTITUTION AND REMEDIATION** [Environmental - Clean Water Act - **33 U.S.C. § 1251** *et seq.*] |

NOW COMES plaintiff CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION, a private corporation ("CEPA") by and through its counsel, and for its Complaint against Defendants SONOMA SOIL BUILDERS, LLC and DOES 1-10, inclusive, (collectively referred to hereafter as "SSB") alleges:

## I.   NATURE OF THE CASE

1.   This is a citizens' suit for relief brought by CEPA under the Federal Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, specifically CWA §§ 301, 402, and 505, 33 U.S.C. §§ 1311, 1342 and 1365, to prevent CEPA from repeated and ongoing violations of the CWA.  These violations are detailed in the Supplemental Notice of

1

1  Violations and Intent to File Suit dated April 30, 2015 ("CWA NOTICE") made part of the

2  pleadings of this case and attached hereto as **EXHIBIT A**.

3  2.      SSB is the responsible owner, operator and/or manager of the Sonoma Soil Builders soil

4  storage, blending and soil manufacturing facility located at 5900 Pruitt Avenue in Windsor,

5  Sonoma County California ("Facility") where the alleged violations of the CWA are occurring.

6  CEPA contends SSB is routinely violating the CWA by discharging pollutants, including but not

7  limited to total suspended solids, pH, chemical oxygen demand, biochemical oxygen demand,

8  potassium, sulfate, oil and grease, lead, iron and zinc, from the Facility and various point sources

9  within the Facility, to waters of the United States including Pool Creek, a tributary of the Russian

10  River, without a National Pollutant Discharge Elimination System ("NPDES") permit, in

11  violation of CWA § 301(a), 33 U.S.C. § 1311(a).

12  3.      The Facility, operating and covered under Standard Industrial Codes ("SIC") 0711 (Soil

13  Preparation Services) and 2875 (Fertilizers, Mixing only), is required to be covered by

14  California's General Industrial Storm Water Permit for Industrial Storm Water Discharges,

15  NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality

16  Order No. 92-12-DWQ (as amended by Water Quality Orders 97-03-DWQ and 2014-0057-

17  DWQ) issued pursuant to CWA § 402(p), 33 U.S.C. § 1342(p) (hereafter, "General Permit"),

18  Failure to obtain coverage under the General Permit is a violation of CWA § 402(p), 33 U.S.C.

19  § 1342(p).

20  4.      CEPA seeks declaratory relief, injunctive relief to prohibit future violations, the

21  imposition of civil penalties, and other relief for CEPA's violations of the CWA as alleged in

22  this Complaint.

23  **II.     PARTIES TO THE ACTION**

24  5.      Plaintiff California Environmental Protection Association ("CEPA") is now, and at all

25  times relevant to this Complaint was, a private corporation duly organized under the laws of the

26  State of California with its main office at 1275 Fourth Street, Suite 141, Santa Rosa, California.

27  The specific purpose of CEPA is to protect, enhance, and help restore the surface and ground

28  waters of California including its rivers, creeks, streams, wetlands, vernal pools, aquifers and

associated environs, biota, flora and fauna, and to educate the public concerning environmental issues associated with these environs. To further these goals, CEPA actively seeks federal and state agency implementation of the CWA and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members. Members of CEPA live in Sonoma County and use and enjoy the waters into which SSB has caused, is causing, and will continue to cause pollutants to be discharged. Members of CEPA have interests in the Laguna de Santa Rosa and the Russian River which have been, are being, or may be adversely affected by SSB's violations of the CWA as alleged in this Complaint. Said members use the affected waters for recreation, sports, boating, kayaking, swimming, hiking, photography, nature outings, and the like. The relief sought will redress the injury in fact to CEPA and its members and the likelihood of future injury and interference with the interests of said members.

6.     CEPA is informed and believes, and on such information and belief alleges, that Defendant SONOMA SOIL BUILDERS, LLC is now, and at all times relevant to this Complaint was, a limited liability corporation organized under the laws of the state of State of California, with its main address at 3245 Cobblestone Drive, Santa Rosa, California.  Further, that SONOMA SOIL BUILDERS, LLC owns and operates the Facility located at 5900 Pruitt Avenue, Windsor, Sonoma County, California.

7.     CEPA is informed and believes, and on such information and belief alleges, that Defendants DOES 1-10 inclusive, respectively, are now, and at all times relevant to this Complaint were, persons, partnerships, corporations and entities, who are, or were, responsible for, or in some way contributed to, the violations which are the subject of this Complaint or are, or were, responsible for the maintenance, supervision, management, operations, or insurance coverage of the Facility and operations taking place at the Facility as identified in the CWA NOTICE and this Complaint.  The names, identities, capacities, and functions of defendants DOES 1 - 10, inclusive, are presently unknown to CEPA.  CEPA shall seek leave of court to amend this Complaint to insert the true names of said DOES defendants when the same have been ascertained.

### III.   JURISDICTIONAL ALLEGATIONS

8.      Under 33 U.S.C. § 1251(e), Congress declared its goals and policies with regard to public participation in the enforcement of the CWA.  33 U.S.C. § 1251(e) provides, in relevant part:

> Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States.

9.      Subject matter jurisdiction is conferred upon this Court by CWA § 505(a)(1), 33 U.S.C. § 1365(a)(1), which states in relevant part,

> " … any citizen may commence a civil action on his own behalf - against any person . . . .who is alleged to be in violation of (A) an effluent standard or limitation. . . . or (B) an order issued by the Administrator or a State with respect to such a standard or limitation ..."

For purposes of CWA § 505, "the term 'citizen' means a person or persons having an interest which is or may be adversely affected." (33 U.S.C. § 1365(g)).

10.     Members and supporters of CEPA reside in the vicinity of, derive livelihoods from, own property near, and/or recreate on, in or near, and/or otherwise use, enjoy and benefit from the waterways and associated natural resources into which SSB allegedly discharges pollutants, or by which SSB's operations at the Facility adversely affect those members' interests, in violation of the protections embedded in the NPDES Permitting program and the General Permit, CWA § 301(a), 33 U.S.C. § 1311(a), CWA § 505(a)(1),  33 U.S.C. § 1365(a)(1), and CWA § 402, 33 U.S.C. § 1342.  The health, economic, recreational, aesthetic and environmental interests of CEPA and its members may be, have been, are being, and will continue to be adversely affected by SSB's unlawful violations as alleged herein. CEPA contends there exists an injury in fact to its members, causation of that injury by SSB's complained of conduct, and a likelihood that the requested relief will redress that injury.

11.     Pursuant to CWA § 505(c)(3), 33 U.S.C. § 1365(c)(3), a copy of this Complaint has been served on the United States Attorney General and the Administrator of the Federal EPA.

12.     Pursuant to CWA § 505(c)(1), 33 U.S.C. § 1365(c)(1), venue lies in this District as the location of the Facility where the alleged illegal discharges occurred, as well as the source of the

4

1  violations complained of in this action, are located within this District.

2  **IV.   GENERAL ALLEGATIONS**

3  13.   CEPA incorporates by reference all the foregoing including EXHIBIT A as though the

4  same were separately set forth herein.

5  14.   SSB owns and operates the Facility which engages in a broad range of soil storage, soil

6  blending and manufacturing activities. Operations at the Facility take place primarily outdoors

7  on a site that slopes towards one or more storm drains and the navigable waters of the Laguna

8  de Santa Rosa and the Russian River, all of which are in close proximity to the Facility.

9  Because the real property on which the Facility is located is subject to rain events, the range of

10  pollutants discharged from the Facility and identified in the CWA NOTICE and this Complaint

11  can discharge to the Laguna de Santa Rosa and the Russian River.

12  15.   CEPA alleges that pollutants are discharged from the Facility during and after storm

13  events. SSB contends that all sheeted run-off is captured by drain inlets which prevents the

14  runoff from reaching any channel from which it can be discharged to a surface water. However

15  based on information and belief, and on visual observations by members of CEPA, it is likely

16  that during major storm events sheeted run-off to the west drainage area reaches the sump pump

17  which conveys water to the drainage ditch adjacent to the Facility which discharges into Pool

18  Creek, a tributary of the Laguna de Santa Rosa and the Russian River, both waters of the United

19  States.

20  16.   CEPA alleges that SSB has no individual NPDES Permit authorizing discharges from

21  point sources at the Facility; and, that for at least eighteen (18) months after opening the Facility,

22  SSB failed to apply for coverage under the General Permit.  Further, even after obtaining

23  coverage under the General Permit, SSB failed to implement Best Available Technology

24  Economically Achievable ("BAT") and Best Conventional Pollutant Control Technology

25  ("BCT") to control the discharge of pollutants in storm water at the Facility.

26  17.   CEPA alleges that SSB's current Storm Water Pollution Prevention Plan ("SWPPP") does

27  not contain a detailed drainage plan, prepared by a hydraulic engineer, with flow calculations,

28  pipe sizing and other standard information needed to determine site drainage, including wash

5

water flow from the equipment storage and maintenance area.

18.     Table 4 of SSB's SWPPP lists K-rails, wattles and bunkers as containment structures for potential pollution sources, i.e. the piles of ingredients and manufactured soils which have the potential to come into contact with storm water runoff.  However, visual inspection by members of CEPA discloses that these structures have deteriorated and are inadequate to actually contain contaminated storm water runoff.  Page 3 of the SWPPP states,  "There are no structural control measures at the Facility".  This is in apparent contradiction with the list of containment structures found in Table 4, and suggests that SSB's SWPPP was prepared in a pro forma manner to satisfy formal requirements without reflecting the actual conditions at the Facility.

19.     CEPA alleges that SSB has been operating the Facility without providing the Regional Water Quality Control Board , North Coast Region ("RWQCB") with any documented results of past facility run-off sampling, in violation of the CWA and the General Permit.  It is also unclear how contributions from the Facility are distinctly identified in samples from commingled drain inlets in the west drainage area conveying run-off from adjacent facilities.

20.     The language in SSB's SWPPP describing Best Management Practices ("BMPs") employed to prevent pollutant runoff is conclusory and qualified as "to the extent feasible",  with minimal or a complete lack of specific detail, e.g., "All stored industrial materials that can be readily mobilized by contact with storm water have been covered to the extent feasible. All stored non-solid industrial materials or wastes (e.g., particulates, powders, shredded paper, etc.) that can be transported or dispersed by the wind or contact with storm water has been contained to the extent feasible." (SWPPP at p.6)   The extent to which the SWPPP qualifies its identification of BMPs based on feasibility and economic practicability, as well as the lack of specific detail, renders SSB's SWPPP illusory.

21.     The Facility is located adjacent to Mark West Creek to the south, Pruitt Creek and Pool Creek to the north, Airport Creek and Pool Creek to the northeast, and the Laguna de Santa Rosa and Russian River to the west – all waters of the United States.  The Russian River is listed under the CWA as impaired for Nutrients (D.O., Nitrogen, Phosphorous), Pathogens (Indicator Bacteria), Metals (Mercury), Misc. (Temperature), and Sediment (Siltation). Receiving water

6

concerns for the Facility are nitrogen, phosphorous and sediment, which are analyzed for as N+N (nitrogen), total phosphorous and TSS (sediment). All illegal discharges and activities complained of in this Complaint occur in close proximity to the above-identified waters and during storm events are highly likely to discharge into the said waters.

22.     The RWQCB has determined that the watershed areas and affected waterways identified in the CWA NOTICE and this Complaint are beneficially used for: water contact recreation, non-contact water recreation, fish and wildlife habitat, preservation of rare and endangered species, fish migration, fish spawning, navigation, and sport fishing.

23.     Information available to CEPA indicates the continued existence of unlawful discharges of pollutants from the Facility into a water of the United States, specifically Pool Creek, the Laguna de Santa Rosa and the Russian River, in violation of the General Permit and the CWA.

## V.     STATUTORY AND REGULATORY BACKGROUND

24.     CWA §301(a), 33 U.S.C. § 1311(a) prohibits the discharge of any pollutant into waters of the United States unless such discharge is in compliance with various enumerated sections of the CWA. Among other things, CWA § 301(a) prohibits discharges not authorized by, or in violation of, the terms of an individual NPDES permit or a general NPDES permit issued pursuant to CWA § 402, 33 U.S.C. § 1342.

25.     CWA § 402(p), 33 U.S.C. § 1342(p) requires SSB to apply for coverage under the General Permit for potential industrial storm water discharges from the Facility to the above referenced waters.

26.     CWA § 502(6), 33 U.S.C. § 1362(6),  defines a pollutant as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal and agricultural waste discharged into water."

27.     CWA § 402(p), 33 U.S.C. § 1342(p), establishes a framework for regulating storm water discharges under the NPDES program. States with approved NPDES permitting programs are authorized under this section to regulate storm water discharges through permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all

storm water dischargers. Pursuant to CWA § 402, the Administrator of the U.S. EPA has authorized the State Water Resources Control Board ("SWRCB") to issue NPDES permits including general NPDES permits in California.

28.     The SWRCB elected to issue a statewide general permit for industrial discharges, and issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, reissued the General Permit on or about April 17, 1997, and amended the General Permit on or about April 1, 2014, pursuant to CWA § 402(p).

29.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained an individual NPDES permit and complied with its terms.

30.     Violators of the CWA are subject to an assessment of civil penalties of up to $37,500 per day/per violation for all violations, pursuant to CWA §§ 309(d) and 505, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1-19.4.

31.     The RWQCB has established water quality standards in the Water Quality Control Plan for the San Francisco Bay Basin, generally referred to as the Basin Plan. The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms". The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses".

32.     The U.S. EPA adopted the National Toxics Rule ("NTR") on February 5, 1993 and the California Toxics Rule ("CTR") on May 18, 2000.  See 40 C.F.R. part 131. When combined with the beneficial use designations in the Basin Plan, these Rules contain water quality standards applicable to this discharge. The SWRCB on April 26, 2000 adopted the *Policy for Implementation of Toxics Standard for Inland Surface Waters, Enclosed Bays, and Estuaries of California* that contains requirements for implementation of the NTR and CTR.  Pursuant to 40 C.F.R. part 131, the CTR "criteria are legally applicable in the State of  California for inland surface waters, enclosed bays and estuaries for all purposes and programs under the Clean Water Act."

8

33.     The General Permit requires the implementation of BMPs that will reduce or eliminate discharges of pollutants from storm water. The General Permit also requires the preparation, implementation, review and update of an adequate SWPPP, the elimination of all non-authorized storm water discharges, and the development and implementation of an adequate monitoring and reporting program for a facility and its operations. The SWPPP must identify  potential pollutants on the site, the source of those pollutants, and the means to manage those sources to reduce storm water pollution. CEPA contends SSB has failed to develop and implement an adequate SWPPP to protect adjacent waters from illegal discharges of pollutants from the Facility.  Failure to develop and implement an adequate SWPPP pursuant to the General Permit is a violation of CWA § 402(p), 33 U.S.C. § 1342(p).

34.     The affected waterways detailed in this Complaint and in the CWA NOTICE are navigable waters of the United States within the meaning of CWA § 502(7), 33 U.S.C. § 1362(7).

## VI.     VIOLATIONS

35.     The enumerated violations are detailed in the CWA NOTICE and below, designating the section of the CWA violated by the described activity.

## VII.    CLAIM FOR RELIEF

**Failure to Comply with the Regulations Set Forth in the General Permit for Stormwater Discharges Associated With Industrial Activities (Violations of 33 U.S.C. § 1342(p))**

36.     CEPA realleges and incorporates by reference the allegations of Paragraphs 1 through 35 as though fully set forth herein including all allegations in the CWA NOTICE.  CEPA is informed and believes, and on such information and belief alleges, as follows:

37.     A discharger involved with industrial activity must obtain a NPDES permit. CWA § 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B).  SSB initially operated the Facility for at least eighteen (18) months without applying for coverage under the General Permit or receiving a separate NPDES Permit for its industrial discharges as required by the CWA. Since obtaining coverage under the General Permit, SSB continues to violate the CWA as evidenced by its failure to comply with the regulations set forth in the General Permit by failing to develop and implement

9

an adequate SWPPP to prevent illegal discharges of pollutants from the Facility.

38.     As described in the CWA NOTICE and herein, pursuant to CWA § 402(p), 33 U.S.C. § 1342(p), and 40 C.F.R. § 122.26, CEPA alleges SSB to be in violation of an effluent standard or limitation under the CWA and/or an order issued by the State with respect to such standard or limitation.  By law and by the terms of the General Permit, violations of the General Permit are violations of the CWA (40 C.F.R. § 122.41(a)).

39.     CEPA contends SSB's violations as alleged in this Complaint are ongoing, and will continue after the filing of this Complaint.  CEPA alleges herein all violations which may have occurred or will occur prior to trial, but for which data may not have been available or submitted or apparent from the face of the reports or data submitted by SSB to the SWRCB, the RWQCB, or to CEPA prior to the filing of this Complaint.  CEPA will amend this Complaint if necessary to address SSB's State and Federal violations of the General Permit which may occur after the filing of this Complaint.  Each of SSB's violations in excess of State and Federal standards has been and is a separate violation of the CWA.

40.     CEPA alleges that without the imposition of appropriate civil penalties and the issuance of appropriate equitable relief, SSB will continue to violate the General Permit as well as State and Federal standards with respect to the enumerated discharges and releases alleged herein and described in the CWA NOTICE.  Further, that the relief requested in this Complaint will redress the injury to CEPA and its members, prevent future injury, and protect the interests of its members that are or may be adversely affected by SSB's violations of the General Permit.

41.     CEPA alleges that continuing violations of the CWA by SSB at the Facility will irreparably harm CEPA and its members, for which harm CEPA and its members have no plain, speedy or adequate remedy at law.

**VIII.   RELIEF REQUESTED**

WHEREFORE, CEPA prays that the Court grant the following relief:

42.     Declare CEPA to have violated and to be in violation of the CWA;

43.     Issue an injunction ordering SSB to immediately operate the Facility in compliance with the NPDES permitting requirements in the CWA;

10

44.     Enjoin SSB from discharging pollutants from the Facility and to the surface waters surrounding the Facility until such time as SSB has developed and implemented an adequate SWPPP, including the following elements:

A.     A Site Plan for the Facility, to scale, developed by a licensed engineer, containing the following elements:

    i.     Buildings, permeable and impermeable areas and stock piles;

    ii.     A topographic map and boundary survey of the Facility site including perimeter areas subject to run-on from nearby facilities;

    iii.     Storm water flow paths to a terminus on or off site showing the exact path of storm water likely to make contact with material stock piles on the Facility including discharge and sampling locations.  In particular, clarifying whether any storm water flow enters Drain Inlet ("DI") 18 and/or any other drain inlets, and how SSB can support its claim that no water can reach the sump pump which conveys water to the drainage ditch adjacent to the Facility which discharges into Pool Creek, a tributary of the Russian River;

    iv.     A detailed drainage plan with flow calculations, pipe sizing and other standard information needed to determine site drainage;

    v.     Wash water flow path from equipment storage and maintenance areas;

    vi.     A description of the filter socks referenced in the current SWPPP as used during the rainy season on drain inlets DI-15 through DI-20 and on DI-23 and DI-24, including the manufacturer, material components, loading capacity and period of effective use until replacement is required.

B.     Update the current SWPPP to include BMPs consistent with the Site Plan developed pursuant to paragraph 44.A. above to ensure consistency with the requirements of the General Permit.

C.     Sampling of storm water at least four (4) times per year over each of the next five (5) years at "first flush", the first significant rain after "first flush," the first significant rain after April 1, and the second significant rain after April 1;

11

45.     Order SSB to pay civil penalties of $37,500 per day/per violation for each violation of the Act pursuant to CWA §§ 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1-19.4;

46.     Order SSB to take appropriate actions to restore the quality of United States waters impaired by its activities on the Facility;

47.     Order SSB to pay CEPA's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and,

48.     Award such other and further relief as may be just and proper.


DATED: October 22, 2015          LAW OFFICE OF JACK SILVER


By: _____
     Jack Silver


_____
Jerry Bernhaut
Attorney for Plaintiff
CALIFORNIA ENVIRONMENTAL PROTECTION
ASSOCIATION