CRAIG A. BRANDT
Attorney at Law
5354 James Avenue
Oakland, CA  94618
(510) 601-1309
craigabrandt@att.net

Attorney for Plaintiff
CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SONOMA SOIL BUILDERS, INC, a California corporation, SHILOH OAKS COMPANY, LLC, a California limited liability company,<br><br>Defendants. | Case No.:  4:15-cv-04880-KAW<br><br>**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL PENALTIES, AND REMEDIATION** |

Plaintiff CALIFORNIA ENVIRONMENTAL PROTECTION ASSOCIATION ("CEPA") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## INTRODUCTION

1.     This action is a citizen suit for injunctive relief, civil penalties, and remediation originally filed against Defendant SONOMA SOIL BUILDERS, INC.

**1**

SECOND AMENDED COMPLAINT

("SONOMA SOIL") on October 23, 2015, for current and ongoing violations of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.  The Complaint was amended on June 9, 2016.

2.      On or about June 14, 2014, CEPA provided an initial Notice of Defendant SONOMA SOIL's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board"), (4) Executive Director of the North Coast Regional Water Quality Control Board ("Regional Board"), and (5) SONOMA SOIL, as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      On or about April 30, 2015, CEPA provided a First Supplemental Notice of Defendant SONOMA SOIL's violations of the CWA to the above parties.

4.      On or about November 1, 2015, CEPA provided a Second Supplemental Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board"), (4) Executive Director of the North Coast Regional Water Quality Control Board ("Regional Board"), and (5) Defendants SONOMA SOIL and SHILOH OAKS COMPANY, LLC, as required by the CWA. 33 U.S.C. § 1365(b)(1)(A), a copy of which is attached hereto.

**2**

SECOND AMENDED COMPLAINT

5.     On or about April 1, 2016, CEPA forwarded a Third Supplemental Notice of Defendants' violations of the CWA to the respective parties.

6.     More than sixty days have passed since CEPA's Notices were served on Defendants, the Regional Board, the State Board, and the Regional and National EPA Administrators.  CEPA is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

8.     Venue is proper because Defendants reside in and the events or omissions giving rise to CEPA's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

9.     Pursuant to this Court's Intradistrict Assignment Rule, Civil Local Rules 3-2(c) and 3-3, this action has been assigned to the Oakland Division.

SECOND AMENDED COMPLAINT

**PARTIES**

10.     Plaintiff CALIFORNIA ENVIRONMENTAL PROTECTION

ASSOCIATION ("CEPA") is a Sonoma County-based environmental membership

organization incorporated under the laws of the State of California. Its members work to

protect, enhance, and assist in the restoration of rivers, creeks, streams, wetlands, vernal

pools, and their tributaries located in California. Members of CEPA reside and work near

the Laguna de Santa Rosa and the Russian River, and use those waters and their

watersheds for recreation, sports, fishing, swimming, hiking, photography, nature walks

and scientific study. Their use and enjoyment of these natural resources are specifically

impaired by defendant's violations of the CWA.

11.     Defendants' ongoing violations of the General Permit and the CWA will

cause irreparable harm to CEPA and its members, for which they have no plain, speedy,

or adequate remedy. The relief requested will redress the ongoing injury in fact to CEPA

and its members.

12.     CEPA is informed and believes, and on such information and belief alleges,

that Defendant SONOMA SOIL BUILDERS, INC., formerly Sonoma Soil Builder, LLC,

("SONOMA SOIL") is the operator of the soil blending facility located at 5900 Pruitt

Avenue, Suite 160, Windsor, Sonoma County, California (the "Facility"). Sonoma Soil

Builders, LLC was formed on October 16, 2012, and is identified in the Regional Board's

records as the operator of the Facility. CEPA is informed and believes that on or about

March 11, 2016, Sonoma Soil Builders, LLC reorganized as Sonoma Soil Builders, Inc.,

**4**

but continues to operate the Facility in the same manner that it did prior to reorganization. Germon Medeiros is identified as the operating manager and owner of SONOMA SOIL in the documents on file with the Regional Board, and is the agent for service of process on Sonoma Soil Builders, Inc.

13.     CEPA is informed and believes, and on such information and belief alleges, that Defendant SHILOH OAKS COMPANY, LLC ("SHILOH") is the legal owner of the property located at 5900 Pruitt Avenue, Suite 160, Windsor, Sonoma County, California, and is Defendant Sonoma Soil Builders' Lessor/Landlord.  John Caletti is identified in the records of the California Secretary of State as the agent for service of process for SHILOH OAKS COMPANY, LLC.

14.     On November 5, 2015, CEPA first provided Notice to Defendant SHILOH of its Lessee/Tenant Defendant SONOMA SOIL's ongoing violations of the General Permit and the CWA.  Defendant SHILOH failed to respond to CEPA's Notice.

15.     Furthermore, Defendant SONOMA SOIL continued to violate the General Permit and the CWA after Defendant SHILOH received Notice of SONOMA SOIL's violations, as evidenced by CEPA's Third Supplemental Notice dated April 1, 2016, and documents and records contained in the public database of the California Environmental Protection Agency, State Water Resources Control Board's Storm Water Multiple Application and Report Tracking System (SMARTS).

16.     CEPA is informed and believes, and thereon alleges that Defendant SHILOH is jointly liable with Defendant SONOMA SOIL for all violations of the

General Permit and CWA herein alleged on the basis that SHILOH had sufficient control over SONOMA SOIL's facility as its legal Lessor/Landlord and had full knowledge of the alleged violations, and nevertheless failed to require its tenant industrial site operator SONOMA SOIL to comply with applicable environmental laws.

**CLEAN WATER ACT**

17.     Congress declared that the CWA was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a). In furtherance of these goals, the CWA prohibits all discharges except those in compliance with an NPDES permit. 33 U.S.C. §§ 1311, 1342. The EPA promulgates regulations to implement the NPDES permitting system at 40 C.F.R. parts 122-129.

18.     Pursuant to the requirements of the CWA, the State Board developed a General Permit for Storm Water Discharges Associated With Industrial Activity ("General Permit") within the state of California. 33 U.S.C. § 1342; 40 C.F.R. § 122.26; NPDES General Permit No. CAS000001, State Board Order No. 92-12-DWQ, amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ. All facility operators subject to storm water permitting ("dischargers"), including those that perform industrial activities, must apply to their Regional Board for an NPDES permit under the General Permit or another NPDES permit. *Id.* Failure to do so violates the CWA. *Id.*; General Permit § XXI.B.

**6**

SECOND AMENDED COMPLAINT

19.     The General Permit strictly prohibits all industrial storm water discharges, unless specific requirements are met, including obtaining coverage under the NPDES system. General Permit §§ I.C, III. The General Permit requires that the discharger (1) prepare, "certify and submit" an Annual Report on the year's discharge activities including compliance with the CWA and General Permit (General Permit § XVI), (2) perform visual observations and conduct sampling and analysis to monitor any discharges (General Permit § XI), and (3) prepare a comprehensive site-specific Storm Water Pollution Prevention Plan ("SWPPP") (General Permit § X), among other requirements. Where a facility operator fails to "comply with all standard conditions [of the] General Permit," it shall "constitute[] a violation of the [CWA] and the Water Code and is grounds for enforcement action and/or removal from General Permit coverage." General Permit § XXI.A; 33 U.S.C. § 1342.

20.     Under the CWA, dischargers are required to submit an Annual Report summarizing the year's monitoring and sampling, and addressing any deficiencies in those required actions. General Permit § XVI; State Board Order No. 97-03-DWQ ("1997 General Permit") § B.14. A discharger's Annual Report for July 1, 2014 through June 30, 2015 is governed by the previous permit – the 1997 General Permit – which remains in effect for the 2014-2015 Annual Report and enforcement requirements only. General Permit §§ Introduction ("as of July 1, 2015 [the General Permit] supersedes [the 1997 General Permit] excerpt for [the 1997 General Permit's] requirement to submit annual

SECOND AMENDED COMPLAINT

reports by July 1, 2015 and except for enforcement purposes"), I.7 (same). Under the 1997 General Permit, dischargers were required to "submit an Annual Report by July 1 of each year" to the Regional Board, which includes "a summary [and evaluation] of visual observations and sampling results," "laboratory reports," a compliance evaluation report, and "an explanation of why a facility did not implement any activities required by the General Permit." 1997 General Permit § B.14; *see also* General Permit § XVI (same requirements with minor changes in the current General Permit). Failure to submit an adequate Annual Report violates the General Permit, and subsequently the CWA. 1997 General Permit § C.1; General Permit § XXI.A; 33 U.S.C. § 1342.

21.     Pursuant to sections B.4 and B.5 of the 1997 General Permit and section XI.B of the current General Permit, dischargers are required to monitor all discharges to ensure compliance with the provisions and purpose of the CWA.

a. The 1997 General Permit required dischargers to perform monthly visual observations, as well as sampling and analysis for the "first storm event of the wet season" and at least one other storm event for "[a]ll storm water discharge locations." 1997 General Permit §§ B.4.a, B.5.a. Where sampling from the first storm event of the season was not possible, dischargers were required to "explain in the Annual Report why [that] storm event was not sampled." 1997 General Permit § B.5.a. Failure to perform the required monitoring or provide any necessary explanations violates the CWA. 1997 General Permit § C.1; General Permit §XXI.A; 33 U.S.C. § 1342.

b. The current General Permit similarly requires extensive monitoring of discharges, including visual observations, sampling, and analysis. General Permit § XI. The General Permit mandates that dischargers "collect and analyze storm water samples from two (2) [Qualifying Storm Events ("QSEs")] within the first half of each reporting year (July 1 to December 31) and two (2) QSEs within the second half of each reporting year (January 1 to June 30)" "from each drainage area at all discharge locations." General Permit §§ XI.B.2 (first quote), XI.B.4 (second quote). Dischargers are then required to "submit all sampling and analytical results for all [samples] via [the Storm Water Multiple Application and Report Tracking System ("SMARTS")] within 30 days of obtaining all results for each sampling event." General Permit § XI.B.11.a. Failure to comply with these General Permit provisions violates the CWA. General Permit § XXI.A ("Permit noncompliance constitutes a violation of the [CWA] and the Water Code and is grounds for enforcement action" or NPDES coverage termination); 33 U.S.C. § 1342.

22.    The General Permit also requires dischargers to "develop and implement a site specific SWPPP for each industrial facility covered by [the] General Permit." General Permit §§I.I.54, X.A. The SWPPP must contain (1) the facility name and contact information, (2) a site map, (3) a list of industrial materials, (4) descriptions of potential pollution sources, (5) an assessment of those sources, (6) minimum Best Management Practices ("BMPs"), (7) advanced BMPs, if necessary, (8) a monitoring implementation plan, (9) an annual evaluation, and (10) dates when the SWPPP was prepared and amended. General Permit § X.A. All of this information must be submitted via SMARTS

"within 30 days" of any significant revisions to the SWPPP, or every three months where there are only minor revisions. General Permit §§ X.B.2, X.B.3.

a. Among the many requirements for an SWPPP, a discharger "shall prepare a site map" that includes "[t]he facility boundary, storm water drainage areas within the facility boundary," "storm water collection and conveyance systems, associated discharge locations," "[l]ocations and descriptions of structural control measures," "[i]dentification of all impervious areas," locations of exposed materials, and "[a]reas of industrial activity subject to this General Permit." General Permit § X.E.3; General Permit Attachment D § F.2 (listing requirements for site map). Failure to prepare an adequate site map renders the SWPPP deficient. General Permit § X.E.

b. All dischargers are required to describe and assess each potential pollutant source in their SWPPP. General Permit § X.G. "The [d]ischarger shall ensure the SWPPP describes each industrial process," "each material handling and storage area," "all industrial activities that generate a significant amount of dust or particulate that may be deposited within the facility boundaries," a "list of any industrial materials that have spilled or leaked," all nonstorm water discharges, and "the facility locations where soil erosion may" occur. General Permit § X.G.1. The discharger shall also "ensure that the SWPPP includes a narrative assessment of all areas of industrial activity with potential industrial pollutant sources." General Permit § X.G.2.a. The discharger's assessment of these sources must include, among other things, the location, type, quantity and physical characteristics of the pollutant, the potential for exposure, all sampling and inspection

records, and the potential effectiveness of the current BMPs to reduce or prevent

pollutants in storm water discharges. General Permit § X.G.2.a.

c. The SWPPP must also "implement and maintain" the minimum BMPs

described in the general permit (General Permit § X.H.1) and any advanced BMPs

"necessary to reduce or prevent discharges of pollutants" (General Permit § X.H.2). The

discharger shall "identify and describe" the implemented BMPs on which it relies to

reduce discharges. General Permit § X.C.1.b. These BMP descriptions shall include:

i. The pollutant(s) the BMP is designed to reduce or prevent . . . ;

ii. The frequency, time(s) of day, or conditions where the BMP is scheduled for

implementation;

iii. The locations within each area of industrial activity or industrial

pollutant source where the BMP shall be implemented;

iv. The individual and/or position responsible for implementing the

BMP;

v. The procedures . . . and/or instructions to implement the BMP

effectively;

vi. The equipment and tools necessary to implement the BMP

effectively; and,

vii. The BMPs that may require more frequent visual observations beyond

the monthly visual observations as described in Section XI.A.1. General Permit §

X.H.4.a. The minimum BMPs that are required in the SWPPP include Good

SECOND AMENDED COMPLAINT

Housekeeping (General Permit § X.H.1.a), Preventative Maintenance (General Permit § X.H.1.b), Spill and Leak Prevention and Response (General Permit § X.H.1.c), Material Handling and Waste Management (General Permit § X.H.1.d), Erosion and Sediment Controls (General Permit § X.H.1.e), Employee Training Programs (General Permit § X.H.1.f), and Quality Assurance and Record Keeping (General Permit § X.H.1.g). The advanced BMPs that may be implemented as necessary include Exposure Minimization (General Permit § X.H.2.b.i), Storm Water Containment and Discharge Reduction (General Permit § X.H.2.b.ii), Treatment Control (General Permit § X.H.2.b.iii), or other BMPs "necessary to meet effluent limitations of this General Permit" (General Permit § X.H.2.b.iv). All dischargers must identify and describe the BMPs implemented. General Permit §§ X.C.1.b, X.H.1, X.H.2, X.H.4.a. Failure to do so invalidates the SWPPP and violates the CWA. General Permit §§ X.C.1.b, X.H, XXI.A; 33 U.S.C. § 1342.

d. Furthermore, the SWPPP must be signed and certified as "true, accurate, and complete," and therefore cannot contain internal contradictions. General Permit §§ I.I.54, II.A., XXI.L; General Permit Appendix 1. Internal inconsistencies would render the SWPPP ineffective under the General Permit and would require revisions to the SWPPP and submission to the SMARTS database. Similarly, missing or incomplete information would require additional research and analysis, revision of the SWPPP and the necessary submission to SMARTS. An incomplete or inconsistent SWPPP violates the General Permit and subsequently the CWA. General Permit §§ XXI.A; 33 U.S.C. § 1342.

SECOND AMENDED COMPLAINT

23.     The "General Permit requires control of pollutant discharges using [Best Available Technology Economically Achievable ("BAT")] and [Best Conventional Pollutant Control Technology ("BCT")] to reduce and prevent discharges of pollutants, and any more stringent effluent limitations necessary for receiving waters to meet applicable water quality standards." General Permit § I.D.32. "Dischargers shall implement BMPs that comply with the BAT/BCT requirements of this General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability." General Permit § V.A.; *see also* 44 C.F.R. § 125.3(a)(2)(i)-(v) (Jan 4, 1989) (NPDES Permits must include technology-based treatment requirements).

24.     Under the CWA, "any citizen may commence a civil action" "against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under [the CWA] or (B) an Order issued by . . . a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). "No action may be commenced . . . prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator [of the EPA], (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A). By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

SECOND AMENDED COMPLAINT

25.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction "to apply any appropriate civil penalties under section 1319(d)." 33 U.S.C. § 1365(a). Section 1319(d) declares that "[a]ny person who violates . . . any permit condition or limitation implementing any of such sections in a[n NPDES] permit . . . shall be subject to a civil penalty not to exceed $[37,500] per day for each violation." 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

26.     Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

### FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

27.     Defendant SONOMA SOIL's Facility blends soils and soil additives, and creates customized soil blends and sands for agricultural and construction use. SONOMA SOIL additionally trucks products to and from the Facility.  CEPA is informed and believes that the Facility falls under standard industrial classification ("SIC") codes 2875 (fertilizers, mixing only) and 4212 (local trucking without storage).

28.     CEPA is informed and believes that the Facility stores large quantities of soil, manure, compost and other soil additives in piles that can be exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

29.     Until SONOMA SOIL belatedly obtained NPDES coverage under the General Permit in October 2014, Defendant SONOMA SOIL had been discharging

SECOND AMENDED COMPLAINT

pollutants to waters of the United States without an NPDES permit in violation of the CWA.  Since October 2014, SONOMA SOIL has committed numerous violations of its permit, many of which are continuing as alleged herein.

30.     CEPA filed this lawsuit against Defendant SONOMA SOIL on October 23, 2015, after providing Defendant with two 60-Day Notices of Intent to Sue, dated June 30, 2014 and April 30, 2015.  Before CEPA notified SONOMA SOIL of its violations, Defendant was discharging storm water into the Russian River watershed without an NPDES permit, and had failed to take action to prevent or minimize such discharges.

31.     CEPA served Defendants with an updated 60-Day Notice of Intent to Sue on or about November 5, 2015.  After CEPA served the November 2015 notice, Defendant SONOMA SOIL uploaded additional information to SMARTS and CEPA became aware of additional CWA violations necessitating CEPA's preparation and service of CEPA's Third Supplemental 60-Day Notice.

32.     Defendant SONOMA SOIL continues to violate the terms of the General Permit and the CWA.

33.     Defendant SONOMA SOIL has failed to file an adequate Annual Report for the 2014-2015 reporting period with the Regional Board as required by Section B.14 of the 1997 General Permit. Despite Section B.14's requirements that an Annual Report include a "summary of visual observations and sampling results, and evaluation of the visual observation and sampling and analysis results, laboratory reports, the Annual Comprehensive Site Compliance Evaluation Report . . . , an explanation of why a facility

did not implement any activities required by the General Permit . . ., and records specified in Section B.13.i," defendant has provided *none* of this information to the Regional Board. Defendant's failure to comply with this requirement constitutes a violation of the CWA. 1997 General Permit, § C.1; 33 U.S.C. § 1342.

34.    Defendant SONOMA SOIL has failed to conduct the required monitoring consistent with the requirements of sections B.4 and B.5 of the 1997 General Permit and section XI.B of the current General Permit.

a.    The 1997 General Permit required defendant to make monthly visual observations during the rainy season to document the presence of potential pollutants in waste discharges during storm events. 1997 General Permit § B.4. Based on those observations, defendant was required to make changes to the Facility's SWPPP. *Id.* The 1997 General Permit required facility operators to collect and report to the Regional Board storm water samples for the first storm event of the wet season, as well as at least one other storm during the wet season.  *Id.* If the defendant was unable to collect samples during the first storm event, it was required to sample and report to the Regional Board a different storm event, and explain in the Annual Report why the first event was not sampled. *Id.* CEPA is informed and believes that defendant has reported none of this information to the Regional Board.

b.    The current General Permit requires samples from *each* drainage area at all discharge locations for each QSE where sampling is performed. General Permit § XI.B. It

SECOND AMENDED COMPLAINT

requires SONOMA SOIL to upload "all sampling and analytical results" to "SMARTS within 30 days of obtaining all results from each sampling event." General Permit § XI.B.11. In violation of these requirements, SONOMA SOIL has failed to consistently sample from all identified sampling locations. For example, CEPA is informed and believes that SONOMA SOIL failed to collect a sample from sampling location 2 ("S-2") during the November 2015 sampling period. The failure to comply with conditions of the General Permit "constitutes a violation of the Clean Water Act and the Water Code and is grounds for an enforcement action . . . ." General Permit § XXI.A; 33 U.S.C. § 1342.

35. SONOMA SOIL's SWPPP, as uploaded to the SMARTS database, is contradictory, incomplete and does not comply with the requirements of the General Permit.

a. The SWPPP fails to accurately and consistently depict the Facility boundaries and structural control measures as implemented, as required by the General Permit. General Permit § X.E.3. Instead, the SWPPP site-map provides inconsistent and contradictory information regarding the Facility boundaries. Further, the SWPPP site-map identifies structural control measures, such as K-rails, in locations different than where they are actually used at the Facility. This violates General Permit section X.E and Attachment D, p. 4.

b. The SWPPP fails to "describe[] the spill or leak prevention and response procedures" when discussing "each material handling and storage area," as required by the General Permit. General Permit § X.G.1.b; SWPPP 13-14. Instead, it merely

SECOND AMENDED COMPLAINT

identifies the areas of the Facility where items are received, stored, mixed and re-stored. SWPPP 14. The SWPPP also fails to characterize "the dust or particulate pollutant[s]" that are generated by dust generating activities at the Facility, as required. General Permit § X.G.1.c; SWPPP 13.

c.   When assessing potential pollutant sources, the SWPPP fails to comport with the General Permit's minimum requirements. General Permit § X.G.2.a. For example, the SWPPP does not "identify the pollutants likely to be present in industrial storm water discharges and authorized NSWDs" (General Permit § X.G.2.a.ii), or "the degree to which the pollutants associated with [each industrial material] may be exposed to, and mobilized by contact with storm water" (General Permit § X.G.2.a.iv).

d.   The SWPPP fails to "identify *and describe*" the implemented minimum and advanced BMPs on which it relies to reduce the Facility's discharges, including all information required by the General Permit. General Permit §§ X.C.1.b (emphasis added), X.H.4.a (list of required BMP information); Notice, pp. 4-6.

i.   The only portion of the SWPPP that describes in detail the Facility's minimum BMPs is Table 5, and even that only discusses the East Drainage Area drain inlet pipe.  Instead of detailing the other BMPs, the SWPPP merely recites the General Permit's minimum BMPs, without a description of *how* those BMPs are implemented by the Facility. SWPPP 15-18, General Permit § X.H. For example, the SWPPP does not identify how the SONOMA SOIL cleans or disposes of leaked materials, or how it minimizes material tracking and dust generation.  SWPPP 15. Similarly, the SWPPP fails

**18**

SECOND AMENDED COMPLAINT

to identify which of its industrial materials the Facility considers to require containment as "non-solid industrial materials or wastes . . . that can be transported or dispersed by the wind or contact with storm water." SWPPP 15. The SWPPP also fails to describe observation and maintenance procedures, as well as procedures to minimize spills and leaks. General Permit §§ X.H.1.b, X.H.1.c. Instead it just asserts that such procedures exist. SWPPP 16, Table 5, Table 6.

ii. The SWPPP likewise fails to describe BMPs to address erosion and sediment based on its erroneous claim that the Facility lacks "erodible surfaces." SWPPP 17. Yet the Facility "blends soils and additives for custom soil blends and sands for a variety of agricultural and construction applications" (SWPPP 10), and does so by storing large quantities of soil and soil components in piles outside, where they are exposed to wind and rain. While these soil piles are placed on top of a paved surface, they are still erodible and create sediment necessitating BMPs.

iii. The SWPPP does not identify areas of the facility where minimum BMPs "will not adequately reduce or prevent pollutants in storm water discharges," which normally would come before the implementation of advanced BMPs. General Permit §§X.G.2.b; X.H.2.a. The SWPPP claims that any advanced BMPs are described in Appendix 4, but Appendix 4 refutes this claim. SWPPP 18. Although Appendix 4 states that "storm resistant shelters . . . have been implemented to prevent the contact of storm water with the identified industrial materials or areas of industrial activity to the extent feasible," in fact the SWPPP fails to: identify the areas where this BMP will be

SECOND AMENDED COMPLAINT

implemented, state whether it will utilize temporary or permanent shelters, describe which materials or activities it intends to shelter, and state what circumstances would render this BMP infeasible, all in violation of the General Permit and the CWA. General Permit §§ X.C.1.b, X.H.4.a; 33 U.S.C. § 1342.

e.    The SWPPP contains multiple inconsistent statements. For example, it identifies non-storm water discharges as a likely source of pollutants (SWPPP Table 4, Mixing Station), yet it also states that the Facility has "no authorized" and no "unauthorized non-storm water discharges." (SWPPP 14). It likewise states that K-rails will be used as containment structures (SWPPP Table 4), while simultaneously claiming that the Facility will not use structural controls (SWPPP 12). Further, SWPPP Appendix 4 implies that defendant has implemented unidentified storm water containment BMPs that are not otherwise addressed in the SWPPP. These contradictory statements highlight the inaccuracies of the SWPPP on file with the Regional Board.

f. The SWPPP is incomplete. For example, the SWPPP contains multiple paragraphs that end mid-sentence. SWPPP 17, 18, 19, Appendix 2, Appendix 3 at Monthly Visual Observations, 3.b.4, 3.c.3.i, 3.c.3.ii, Appendix 3 at Exceedance Response Action 2.b.1, Appendix 3 at Annual Comprehensive Facility Compliance Evaluation 2. Additionally, the certification for the SWPPP ends mid-sentence and provides no signature. SWPPP vi. CEPA is therefore informed and believes that the SWPPP is not certified as required by the General Permit. General Permit §§ I.I.54, II.A, XXI.L.

36.     CEPA is informed and believes that the inadequate and ill-defined BMPs discussed above have not sufficiently reduced or prevented discharges of pollutants from the Facility. The Discharger has failed to identify and implement BMPs that comply with the requirements of the General Permit for BCT for conventional pollutants, and BAT for toxic and non-conventional pollutants. These technology-based pollution controls are supposed to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability. See General Permit §§ I.C, V.A.

37.     Information available to CEPA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the adjacent Pool Creek, a tributary of the Russian River.

## FIRST CAUSE OF ACTION
### (Violations of the Clean Water Act)

38.     Each and every allegation set forth in this Complaint is incorporated herein by reference.

39.     Each day since February 24, 2013, SONOMA SOILS has failed and is continuing to fail to comply with the NPDES permitting requirements of the CWA, and in particular the General Permit, and the 1997 General Permit, because it has failed and continues to fail to:

a. file an adequate Annual Report;

b. adequately monitor discharges;

c. prepare and certify a compliant SWPPP; and

d. implement appropriate control technology.

40.     Noncompliance with the General Permit constitutes a violation of the CWA. General Permit § XXI.A; 1997 General Permit § C.1; 33 U.S.C. § 1342.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.     Declare Defendants to have violated and to be in violation of the CWA;

2.     Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements in the CWA;

3.     Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding the Facility until such time as SONOMA SOILS has developed and implemented an adequate SWPPP;

4.     Order Defendants to pay civil penalties of $37,500 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 (Dec. 11, 2008), 19.2-19.4 (Nov. 6, 2013);

5.     Order Defendants to take appropriate actions to restore the quality of United States waters impaired by its activities on the Facility;

6.     Order Defendants to pay CEPA's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

SECOND AMENDED COMPLAINT

7.      Award such other and further relief as may be just and proper.

Dated: October 2, 2017                    Respectfully,
                                          Craig A. Brandt


                                          By: __ /S/__Craig A. Brandt_____
                                              Craig A. Brandt
                                              Attorney for Plaintiff

SECOND AMENDED COMPLAINT

**PROOF OF SERVICE**

I, Craig A. Brandt, hereby declare:

My business address is the Law Offices of Craig A. Brandt, 5354 James Avenue, Oakland, California 94618.

On October 2, 2017, I served the following document described as

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL PENALTIES, AND REMEDIATION**

by electronic filing with the Clerk of the Court using the CM/ECF system, which sends notification of such filing to the email addresses registered in the above entitled action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 2, 2017

By: ___/S/__*Craig A. Brandt*_____
     Craig A. Brandt
     Attorney for Plaintiff

SECOND AMENDED COMPLAINT

**Jerry Bernhaut, Esq.**
**Law Office of Jerry Bernhaut**
**23 Woodgreen Street**
**Santa Rosa, CA 95409**
**Telephone: (707) 595-1852**
**E-mail: j3bernhaut@gmail.com**

*Via Certified Mail -*
*Return Receipt Requested*

November 5, 2015

Germon Medeiros - Registered Agent
Owners and Operators
Sonoma Soil Builders LLC
3245 Cobblestone Dr.
Santa Rosa CA 95404

John Caletti
Members and Partners
Shiloh Oaks Company LLC
5892 Pruitt Avenue
Windsor, CA 95492

Re:     **Second Supplemental Notice of Violations and Intent to File Suit Under**
        **the  Federal Water Pollution Control Act (Clean Water Act)**

Dear Mr. Medeiros, Mr. Caletti, Owners and Operators, Members and Partners:

**NOTICE**

This Supplemental Notice is provided on behalf of California Environmental
Protection Association ("CEPA") in regard to violations of the Clean Water Act ("CWA"
or "Act") 33 U.S.C. § 1251 *et seq*., that CEPA believes are occurring at the Sonoma Soil
Builders, LLC facility located at 5900 Pruitt Avenue in Windsor, California.  Notice is being
sent to you as the responsible owners, officers, operators and/or managers of this facility and
property. This Notice addresses the violations of the CWA including violation of the terms
of the California's Statewide General Permit for Dischargers of Storm Water for Industrial
Activities, and the unlawful discharge of pollutants from the Sonoma Soil Builders, LLC
facility in Windsor into Pool Creek, a tributary of the Russian River (which is CWA § 303(d)
listed as impaired for sediment, temperature, and bacteria). This Notice supplements the
April 30, 2015 Supplemental Notice of Violations served on Sonoma Soil Builders, LLC.

ATTACHMENT 1

CWA § 505(b) requires a citizen to give notice of the intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the state in which the violations occur.

As required by the Act, this Notice provides notice of the violations that have occurred, and continue to occur, at the Sonoma Soil Builders facility and property. Consequently, Sonoma Soil Builders, LLC and Shiloh Oaks Company, LLC (collectively hereafter, the "Discharger") is placed on formal notice by CEPA that after the expiration of sixty (60) days from the date this Notice is served upon the Discharger, CEPA will be entitled to bring suit in the United States District Court against the Discharger, or amend its current suit, filed in the United States District Court, Northern District of California, titled *California Environmental Protection Association v. Sonoma Soil Builders, LLC, et al,* Case No. 3:15-cv-04880 KAW, for continuing violations of an effluent standard or limitation, National Pollutant Discharge Elimination System ("NPDES") permit condition or requirement, or Federal or State Order issued under the Act (in particular, but not limited to, CWA §§ 301(a), 402(p), and 505(a)(1)), as well as the failure to comply with requirements set forth in the Code of Federal Regulations and the North Coast Regional Water Quality Control Board ("RWQCB") Water Quality Control Plan or "Basin Plan."

The CWA requires that any Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto shall include sufficient information to permit the recipient to identify the following:

     *1.     The specific standard, limitation, or order alleged to have been violated.*

To comply with this requirement, CEPA notices the Discharger of ongoing violations of the substantive and procedural requirements of CWA § 402(p) and violations of NPDES Permit No. CAS000001, State Water Resources Control Board Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ (the "General Permit") relating to soil blending and manufacturing activities at the Sonoma Soil Builders, LLC facility at 5900 Pruitt Road in Windsor (the "Facility").

The Discharger filed a Notice of Intent ("NOI") with respect to the Facility, agreeing to comply with the terms and conditions of the General Permit. The State Water Resources Control Board approved the NOI and the Discharger was assigned Waste Discharger Identification ("WDID") number I 49I025096. CEPA contends that in its operations of the Facility, the Discharger has failed and is failing to comply with the terms and conditions of the General Permit requiring the preparation, implementation, review and update of an adequate Storm Water Pollution Prevention Plan ("SWPPP"), the elimination of all non-authorized storm water discharges, and the development and implementation of an adequate monitoring and reporting program.

The CWA prohibits storm water discharges without a permit. 33 U.S.C. § 1342; 40 C.F.R. § 122.26. The General Permit prohibits the discharge of material other than storm water to waters of the United States which causes or threatens to cause pollution, contamination, or nuisance. The General Permit also prohibits the discharge of storm water to surface water or groundwater that adversely impacts human health or the environment. Discharges from the Facility site contain pollutants including, but not limited to, total suspended solids, pH, chemical oxygen demand, biochemical oxygen demand, potassium, sulfate, oil and grease, lead, iron and zinc, which are discharged from the Facility and various point sources within the Facility to waters of the United States including Pool Creek, a tributary of the Laguna de Santa Rosa and the Russian River – waters of the United States. Violations of the General Permit are violations of the Act, specifically CWA § 301(a) and CWA § 402(p).

2.    *The activity alleged to constitute a violation.*

Operations at the Facility include a broad range of soil storage, soil blending and manufacturing activities which take place primarily outdoors on a site that slopes towards one or more storm drains and the navigable waters of the Laguna de Santa Rosa and the Russian River, all of which are in close proximity to the Facility.  Because the real property on which the Facility is located is subject to rain events, the range of pollutants discharged from the Facility and identified in this Supplemental Notice can discharge to the Laguna de Santa Rosa and the Russian River.  CEPA alleges that the Discharger's current Storm Water Pollution Prevention Plan ("SWPPP") for the Facility does not contain a detailed drainage plan, prepared by a hydraulic engineer, with flow calculations, pipe sizing and other standard information needed to determine site drainage, including wash water runoff, as required under the Section X.E.3.a. of  Order No. 2014-0057-DWQ and Section A(4) of prior Order No. 97-03-DWQ.

CEPA alleges that pollutants are discharged from the Facility during and after storm events.  The Discharger contends that all sheeted run-off is captured by drain inlets which prevent the runoff from reaching any channel from which it can be discharged to a surface water.  However based on information and belief and on visual observations by members of CEPA, it is likely that during major storm events sheeted run-off to the west drainage area reaches the sump pump which conveys water to the drainage ditch adjacent to the Facility which discharges into Pool Creek, a tributary of the Laguna de Santa Rosa and the Russian River.

CEPA alleges the Discharger does not possess an individual NPDES Permit authorizing discharges from point sources within the Facility.  CEPA alleges that for at least eighteen (18) months after opening the Facility, the Discharger failed to apply for coverage under the General Permit.  Further, even after obtaining coverage under the General Permit, the Discharger failed to implement Best Available Technology Economically Achievable

("BAT") and Best Conventional Pollutant Control Technology ("BCT") to control the discharge of pollutants in storm water at the Facility as required under Section X.C.1.b. of Order No. 2014-0057-DWQ and under Section A(2) of prior Order No. 97-03-DWQ.

Table 4 of the Discharger's SWPPP for the Facility lists K-rails, wattles and bunkers as containment structures for potential pollution sources, i.e. the piles of ingredients and manufactured soils which have the potential to come into contact with storm water runoff. However visual inspection by members of CEPA discloses that these structures have deteriorated and are inadequate to actually contain contaminated storm water runoff.  Page 3 of the SWPPP states, "There are no structural control measures at the Facility".  This is in apparent contradiction with the list of containment structures found in Table 4, and suggests that the SWPPP was prepared in a pro forma manner to satisfy formal requirements without reflecting the actual conditions at the Facility.

CEPA contends the Discharger has been operating the Facility without providing the RWQCB with any documented results of past facility run-off sampling, in violation of the CWA and the General Permit as required under Section XI.B.11.a of Order No. 2014-0057-DWQ and under Section B(14) of prior Order No. 97-03-DWQ.

It is also unclear how contributions from the Facility are distinctly identified in samples from commingled drain inlets in the west drainage area which also convey run-off from adjacent facilities.

The language in the Discharger's SWPPP describing Best Management Practices ("BMPs") employed to prevent pollutant runoff is conclusory and qualified as "to the extent feasible", with minimal or a complete lack of specific detail, e.g. –  "All stored industrial materials that can be readily mobilized by contact with storm water have been covered to the extent feasible. All stored non-solid industrial materials or wastes (e.g., particulates, powders, shredded paper, etc.) that can be transported or dispersed by the wind or contact with storm water has been contained to the extent feasible."  (SWPPP at p.6)[1] The extent to which the SWPPP qualifies its identification of BMPs based on feasibility and economic practicability, as well as the lack of specific detail, renders the SWPPP illusory and therefore in violation of the General Permit's requirements regarding BMPs under Sections X.H.1.a.ii-vi of Order No. 2014-0057-DWQ and Section A(2) of prior Order No. 97-03-DWQ.

---

[1] See footnote 12, General Permit p.30:  "For the purposes of this General Permit, the requirement to implement BMPs "to the extent feasible" requires Dischargers to select, design, install and implement BMPs that reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability."

The Facility is located adjacent to Mark West Creek to the south, Pruitt Creek and Pool Creek to the north, Airport Creek and Pool Creek to the northeast, and the Laguna de Santa Rosa and Russian River to the west – all waters of the United States. The Russian River is listed under the CWA as impaired for Nutrients (D.O., Nitrogen, Phosphorous), Pathogens (Indicator Bacteria), Metals (Mercury), Misc. (Temperature), and Sediment (Siltation). Receiving water concerns for the Facility are nitrogen, phosphorous and sediment, which are analyzed for as N+N (nitrogen), total phosphorous and TSS (sediment). All illegal discharges and activities described in this Notice occur in close proximity to the above-identified waters and during storm events are highly likely to discharge to said waters.

The RWQCB has determined that the watershed areas and affected waterways identified in this Supplemental Notice are beneficially used for: water contact recreation, non-contact water recreation, fish and wildlife habitat, preservation of rare and endangered species, fish migration, fish spawning, navigation, and sport fishing. Information available to CEPA indicates the continuation of unlawful discharges of pollutants from the Facility into waters of the United States, specifically Pool Creek, the Laguna de Santa Rosa and the Russian River, in violation of the General Permit and the CWA. CEPA is informed and believes, and on such information and belief alleges that these illegal discharges will continue to harm beneficial uses of the above-identified waters until the Discharger develops a SWPPP with adequate information regarding the fate of pollutants in storm water runoff from the Facility site and implements BMPs based on said information.

3.   *The person or persons responsible for the alleged violation.*

The persons and entities responsible for the alleged violations are Sonoma Soil Builders, LLC as owner and operator of the Facility, and Shiloh Oaks Company, LLC as owner of the real property located at 5900 Pruitt Avenue in Windsor, California, collectively referred to herein as the Discharger, as well as those owners, members, partners and employees of the Discharger responsible for compliance with the General Permit.

4.   *The location of the alleged violation.*

The location of the various violations addressed in this Supplemental Notice is the permanent address of the Facility at 5900 Pruitt Avenue in Windsor, Sonoma County California, including the waters of Pool Creek, the Laguna de Santa Rosa and the Russian River – all waters of the United States.

5.   *The date or dates of violation or a reasonable range of dates during which the alleged activity occurred.*

The range of dates covered by this Supplemental Notice is from April 20, 2013 through November 1, 2015. CEPA may further update this Supplemental Notice to include

all violations which occur after the range of dates covered by this Supplemental Notice. Some of the violations are continuous in nature, and therefore each day constitutes a violation.

6.    *The full name, address, and telephone number of the person giving notice.*

The entity giving this Supplemental Notice is California Environmental Protection Association ("CEPA") is a private corporation duly organized under the laws of the State of California with a main office at 1275 Fourth Street, Suite 141, Santa Rosa, California. The specific purpose of CEPA is to protect, enhance, and help restore the surface and ground waters of  California including its rivers, creeks, streams, wetlands, vernal pools, and tributaries.  To further these goals, CEPA actively seeks federal and state agency implementation of the CWA and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

CEPA has retained legal counsel with respect to the issues set forth in this Notice.  All communications should be directed to:

Jerry Bernhaut, Esquire            Jack Silver, Esq.
Law Office of Jerry Bernhaut       Law Office of Jack Silver
23 Woodgreen Street                P.O. Box 5469
Santa Rosa, CA 95409               Santa Rosa, CA 95402-5469
Telephone: (707) 595-1852          Telephone (707) 528-8175
E-mail: j3bernhaut@ygmail.com      Email: lhm28843@sbcglobal.net

**STATUTORY BACKGROUND**

CWA § 301(a), 33 U.S.C. § 1311(a) prohibits the discharge of any pollutant into waters of the United States unless such discharge is in compliance with various enumerated sections of the Act. Among other things, CWA § 301(a) prohibits discharges not authorized by, or in violation of, the terms of an individual NPDES permit or a general NPDES permit issued pursuant to CWA § 402(p), 33 U.S.C. § 1342 . CWA § 402(p), 33 U.S.C. § 1342(p) establishes a framework for regulating storm water discharges under the NPDES program. States with approved NPDES permitting programs are authorized under this section to regulate storm water discharges through permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all storm water dischargers. Pursuant to CWA § 402, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board to issue NPDES permits including general NPDES permits in California.

The State Water Resources Control Board elected to issue a statewide general permit for industrial discharges, and issued the General Permit on or about November 19, 1991,

modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to CWA § 402(p).  Order No. 97-03-DWQ was superseded by Order No. 2014-0057-DWQ and adopted by the State Water Resources Control Board on April 1, 2014.  In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained an individual NPDES  permit and complied with its terms.

The  General  Permit  contains  certain  absolute  prohibitions. The  General  Permit prohibits  the  direct  or  indirect  discharge  of  materials  other  than  storm  water  ("non-storm water discharges") which are not otherwise regulated by a NPDES permit, to waters of the United States. Order No. 2014-0057-DWQ,  Discharge Prohibition Order Section III(B), Order  No.  97-03-DWQ,  Discharge  Prohibition  Order  Section  A(1). The  General  Permit Prohibits storm water discharges and authorized non-storm water discharges that cause or threaten  to  cause  pollution,  contamination,  or  nuisance,  Order  No.  2014-0057-DWQ, Discharge Prohibition  Order Section III ( C), Order No. 97-03-DWQ, Discharge Prohibition Order Section A(2).

The General Permit requires that Dischargers shall insure that industrial storm water discharges  and  authorized  non-storm  water  discharges  do  not  cause  or  contribute  to  an exceedance of any applicable water quality standards in any affected receiving water, Order No.2014-0057-DWQ,  Receiving  Water  Limitation  Order  Section  VI.A,  Order  No. 97-03-DWQ , Receiving Water Limitation Order Section C.2.  The General Permit  requires that Dischargers shall ensure that industrial storm water discharges and authorized non-storm water discharges do not adversely affect human health or the environment, Order No. 2014-0057-DWQ  Receiving  Water  Limitation  Order  Section  VI.B,  Order  No.  97-03-DWQ, Receiving  Water  Limitation  Order  Section  C.1.    The  General  Permit  requires  that Dischargers shall ensure that industrial storm water discharges and authorized non-storm water discharges do not contain pollutants in quantities that threaten to cause pollution or a public nuisance, Order No. 2014-0057-DWQ Receiving Water Limitation Order Section VI .C.

In  addition  to  absolute  prohibitions,  the  General  Permit  contains  a  variety  of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a NOI  to be covered under the General Permit.  Dischargers must also develop and implement a SWPPP which must comply with the standards of BAT and BCT. As detailed above, CEPA contends the Discharger's SWPPP fails to identify, and the Discharger has failed to implement,  BMPs which comply with the standards of BAT and BCT.  Further, that the Discharger has failed to comply with the the General Permit's requirements to develop and implement  an adequate monitoring and reporting program.

As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented. Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report (see Order No. 97-03-DWQ, Section B(14), Order No. 2014-0057-DWQ Section XI.A. Dischargers must also collect and analyze storm water samples from at least two storms per year in compliance with the criteria set forth in Order No. 97-03-DWQ, Section B(5), and Order No. 2014-0057-DWQ Section XI.B. Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution in compliance with Order No. 97-03-DWQ, Section B(7).

The General Permit requires dischargers to submit an "Annual Report" each year to the executive officer of the relevant Regional Water Quality Control Board. The General Permit requires dischargers to include in the annual report an evaluation of the discharger's storm water controls including certifying compliance with the General Permit, Order No. 97-03-DWQ Permit Section A(9)(d), Order No. 2014-0057-DWQ Section XVI.

The EPA has established Parameter Benchmark Values ("EPA Benchmarks") as guidelines for determining whether a facility discharging storm water has implemented the requisite BAT and BCT. (65 Fed. Reg. 64746, 64767 (Oct. 30, 2000)). California Toxics Rule ("CTR") limitations are also applicable to all non-storm water and storm water discharges. (40 C.F.R. part 131).

The RWQCB has established applicable water quality standards. This Basin Plan includes a narrative toxicity standard and a narrative oil and grease standard. The Basin Plan provides that "Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses." The Basin Plan establishes limits on metals, solvents, pesticides and other hydrocarbons.

## VIOLATIONS

CEPA contends as follows:

1.      The Discharger initially operated the Facility for at least eighteen (18) months, between April of 2013 and October of 2014, without applying for coverage under the General Permit or receiving a separate NPDES Permit for its industrial discharges as required by the CWA. Since obtaining coverage under the General Permit, the Discharger continues to violate the CWA as evidenced by its failure to comply with the regulations set forth in the General Permit, and by failing to develop and implement an adequate SWPPP to prevent illegal discharges of pollutants from the Facility.

2.      As of the date of this Supplemental Notice the Discharger has failed to submit any sampling results to the State "SMARTS" reporting system as required under the General Permit.

3.      CEPA alleges the Discharger to be in violation of an effluent standard or limitation under the CWA and/or an order issued by the State with respect to such standard or limitation. By law and by the terms of the General Permit, violations of the General Permit are violations of the CWA (40 C.F.R. § 122.41(a)).

## REMEDIAL MEASURES REQUESTED

CEPA believes that implementation of the following remedial measures are necessary in order to bring the Discharger into compliance with the CWA and reduce the biological impacts of its non-compliance upon public health and the environment surrounding the Facility:

1.      Development of a Site Plan to Scale by a licensed engineer, containing the following elements:

a.      Buildings, permeable and impermeable areas and stock piles on the Facility site.

b.      A topographical map and boundary survey of the Facility site including perimeter areas subject to run-on from nearby facilities.

c.      Storm water flow paths to a terminus on or off site showing the exact path of storm water likely to make contact with material stock piles at the Facility site including discharge and sampling locations.  In particular, clarification as to whether any storm water flow enters Drain Inlet ("DI") 18 and/or any other drain inlets and how the Discharger supports its claim that no water can reach the sump pump which conveys water to the  drainage ditch adjacent to the site which discharges into Pool Creek, a tributary of the Russian River.

d.      A detailed drainage plan with flow calculations, pipe sizing and other standard information needed to determine site drainage.

e.      Wash water flow path from equipment storage and maintenance areas on the Facility site.

f.      A description of the filter socks referenced in the Discharger's SWPPP as used during the rainy season on DI-15 through DI-20 and on DI-23 and DI-24, including the manufacturer, material components, loading capacity and period

of effective use until replacement is required.

2.  Amendment and updating of the current SWPPP for the Facility within (1) month
    after developing the Site Plan referenced above, to include BMPs consistent with the
    Site Plan ensuring consistency with the requirements of the General Permit.  The
    Discharger shall provide a copy of the updated SWPPP to CEPA for review and
    CEPA's concurrence within thirty (30) days after completion.

    a.  Within (1) month of completion of the updated SWPPP, the measures required
        under the updated SWPPP shall be implemented.

3.  Sampling of storm water at least four (4) times per year over each of the next five (5)
    years: at "first flush", the first significant rain after "first flush",  the first significant
    rain after April 1, and the second significant rain after April 1.  Any discharge from
    the Facility to waters of the United States must be sampled during the four (4)
    sampling events identified.

4.  100% of the discharge from the Facility must be discharged through discreet
    conveyances.

5.  Submission to CEPA of any annual or other monitoring reports not otherwise
    uploaded to and made available on the State Water Resources Control Board's
    SMARTS database, including a copy of any report concerning industrial stormwater
    issues addressed in this Supplemental Notice.  Copies may be furnished to CEPA in
    either hard copy or digital format.

**CONCLUSION**

The violations set forth in this Notice effect the health and enjoyment of members of
CEPA who reside and recreate in the Pool Creek, Laguna de Santa Rosa watershed. Members
of CEPA use the watershed for recreation, sports, fishing, swimming, hiking, photography,
nature walks and the like. Their health, use and enjoyment of this natural resource is
specifically impaired by the Discharger's violations of the CWA as set forth in this Notice.

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any
"person," including individuals, corporations, or partnerships, for violations of NPDES
permit requirements and for un-permitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1)
and (f), §1362(5).  An action for injunctive relief under the CWA is authorized by 33 U.S.C.
§1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to
$37,500 per day/per violation for all violations pursuant to Sections 309(d) and 505 of the
Act, 33 U.S.C. §§ 1319(d), 1365.  See also 40 C.F.R. §§ 19.1-19.4.  CEPA believes this
Notice sufficiently states grounds for filing suit in federal court under the "citizen suit"

provisions of CWA to obtain the relief provided for under the law.

The CWA specifically provides a 60-day notice period to promote resolution of disputes. CEPA encourages the Discharger and/or its counsel contact counsel for CEPA within 20 days of receipt of this Supplemental Notice to initiate a discussion regarding the allegations detailed in this Supplemental Notice.

In the absence of productive discussions to resolve this dispute, or receipt of additional information demonstrating that the Discharger is in compliance with the strict terms and conditions of the General Permit and the CWA, CEPA will have cause to file a citizen's suit under CWA § 505(a) when the 60-day notice period ends, or to amend its current suit filed in the U.S. District Court, Northern District of California, titled *California Environmental Protection Association v. Sonoma Soil Builders, LLC, et al,* Case No. 3:15-cv-04880 KAW.

Sincerely,

Jerry Bernhaut

JB:lhm
cc:    Jack Silver, Esq.

*Service List*

Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Regional Administrator
U.S. Environmental Protection Agency Region 9
75 Hawthorne St.
San Francisco, CA 94105

Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812-0100

Executive Officer
Regional Water Quality Control Board - North Coast Region
5550 Skylane Blvd, Ste. A
Santa Rosa, CA 95403

Peter L. Simon, Esq.
BEYERS COSTIN SIMON
200 Fourth St. Suite 400
P.O. Box 878
Santa Rosa, CA 95402-0878

Marlon V. Young - Registered Agent
Shiloh Oaks Company LLC
3554 Round Barn Blvd. Suite 303
Santa Rosa, CA 95403